JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT K. MEYER, | Case No.  8:19-cv-01725 JLS (ADS) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: CROSS MOTIONS FOR JUDGMENT (Docs. 32-33)** |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | |
| Defendant. | **ORDER GRANTING REQUEST FOR JUDICIAL NOTICE** |

This action arises out of Plaintiff Scott K. Meyer's claim for benefits under a policy for long-term disability insurance issued by Unum Life Insurance Company of America ("Unum"). Plaintiff's claim was originally based on certain physical and cognitive ailments that he contends arose due to a motor vehicle accident. Unum approved Plaintiff's claim to the extent it was based on the (since resolved) physical ailments, but did not approve Plaintiff's claim based on reports of his cognitive dysfunction, which he contends arose because he suffered a concussion in the accident. After paying long-term disability ("LTD") benefits for a period of approximately 12 months, Unum terminated Plaintiff's benefits. As part of the claims process, Plaintiff administratively appealed the termination, but the termination was upheld by Unum. Thereafter, Plaintiff filed the present claim for benefits pursuant to the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The focus of the present action is whether Plaintiff has shown he was disabled during the relevant time period, under the relevant policy provisions, as a result of cognitive dysfunction.

The parties have filed Opening and Responsive Trial Briefs. (*See* Docs. 32-33, 35-36.) The Court considered has considered the parties' arguments presented therein, their arguments made at the proceeding on February 23, 2021, the Administrative Record ("AR") filed by Defendant Unum Life Insurance Company of America ("Unum"), the extrinsic evidence admitted by the Court on December 21, 2020, and the evidence that is the subject of Plaintiff's request for judicial notice. (*See* Docs. 31 (sealed), 35-1, 46-47.)

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the findings of fact and conclusions of law set forth below.[1] The Court reviews *de novo* Unum's decision to terminate LTD benefits. (*See* Docs. 24-25.) As set forth more fully below, the Court concludes that Plaintiff remained eligible for LTD benefits when

---

[1] To the extent any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact. To the extent any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

1  those benefits were terminated effective October 6, 2018.

2  **I.     EVIDENCE OF RECORD**

3       The evidence before the Court may be summarized as follows.

4       **A.     Long-Term Disability Policy**

5       Plaintiff was employed by McDermott & Bull Executive Search as an executive

6  recruiter.[2]  (57.)[3]  As a result of his employment, he was insured under a group LTD

7  insurance policy.  (*See* 2441-2483.)  The Policy provides for LTD benefits to age 65,

8  with a maximum monthly LTD benefit of 60% of the employee's monthly pre-

9  disability earnings for the calendar year prior to the onset of disability, minus

10  applicable offsets. (2446, 2457, 2460.)  Plaintiff's monthly income was $13,154.85

11  per month, and 60% of that amount is $7,892.91.  (865.)  Relevant to the first 24

12  months of disability, the Policy defines "disabled" in the following manner:

13       You are disabled when Unum determines that:

14            - you are limited from performing the material and substantial
15       duties of your regular occupation due to your sickness or injury; and

16            - you have a 20% or more loss in your indexed monthly earnings
17       due to the same sickness or injury.

18  (2456 (emphasis omitted).)  "Regular occupation" is defined as "the occupation you

19  are routinely performing when your disability begins . . . as it is normally performed

20  in the national economy." (2473.)  "Material and substantial duties" are defined as

21  those "duties that . . . are normally required for the performance of your regular

22  occupation . . . and cannot be reasonably omitted or modified." (2471.)  "Sickness"

23  means "illness or disease." (2473.)  "Injury" is defined as "a bodily injury that is the

24  direct result of an accident and not related to any other cause." (2471.)  "Disability"

---

[2] Plaintiff's regular occupation may be described generically as an executive recruiter, but his actual job title was "Principal Consultant." (*See, e.g.*, 1381.) Below, the Court makes specific factual findings regarding Plaintiff's regular occupation.
[3] All citations identifying only a page number are citations to the Administrative Record. (*See* Doc. 31.)

due to either "sickness" or "injury" must begin while the insured is covered under the policy.  (2471.)

> After the first 24 months, the relevant definition of "disabled" changes:
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(2456 (emphasis omitted).)

Under the Policy, Unum paid LTD benefits to Plaintiff beginning October 13, 2017, but it terminated those benefits effective October 6, 2018.  (814, 1246-47.)

### B.    Plaintiff's "Regular Occupation"

Plaintiff's "regular occupation" as an executive recruiter is described by the vocational consultant engaged by Plaintiff's counsel to assist in Plaintiff's appeal of Unum's termination of his benefits.  (1370-99.)  Charles Galarraga, M.S., CRC, LCPC,[4] described Plaintiff's occupation:

> Mr. Meyer's occupation of Principal Consultant requires strong communication skills including the ability to interact intelligently and meaningfully with high level executives, the ability to express himself articulately and to attend to details expressed in meetings, to conduct research and to make abstract analyses, to adhere to deadlines, to manage time effectively, to plan and organize aspects of his business, to effectively multi-task among meetings and clients, and to attend to and retain new information over time.

(1371.)  Galarraga analyzed Plaintiff's work history and identified three job classifications in the Directory of Occupational Titles ("DOT") as representative of Plaintiff's regular occupation:  Personnel Recruiter, Consultant, and Manager of an

---

[4]  Galarraga is a Vocational Rehabilitation Counselor.  (1397.)  He holds master's degrees in psychosocial rehabilitation and mental health counseling.   He is a certified rehabilitation counselor ("CRC") and a licensed psychotherapist.

Advertising Agency.  (1381.)

Unum requested that Senior Vocational Rehabilitation Consultant, Kelly B. Marisano, M.Ed., CRC, review Galarraga's report.[5]  (*See* 2397-2400.)  Marisano criticized Galarraga's combination of these three job classifications, but she conceded that his choice of the classification of Personnel Recruiter was "most consistent with" Plaintiff's regular occupation, and she conceded that another Unum vocational review identified that the most relevant DOT classification was "Consultant." (2398.) Marisano acknowledged the duties of Executive Recruiter as follows:

> Reviews employment applications and evaluates work history, education and training, job skills, compensation needs, and other qualifications of applicants.  Records additional knowledge, skills, abilities, interests, test results, and other data pertinent to selection and referral of applicants.  Reviews job orders and match applicants with job requirements, utilizing manual or computerized file search.  Informs applicants of job duties and responsibilities, compensation and benefits, work schedule and working conditions, organization and union policies, promotional opportunities, and other related information.  Refers selected applicants to person placing job order, according to policy of organization.  Keeps records of applicants not selected for employment. May perform reference and background checks on applicants.  May refer applicants to vocational counseling services.  May conduct or arrange for skills, intelligence, or psychological testing of applicants.  May evaluate selection and placement techniques by conducting research or follow-up activities and conferring with management and supervisory personnel. May contact employers in writing, in person, or by telephone to solicit orders for job vacancies for clientele or for specified applicants and

---

[5] Like Galarraga, Marisano is a certified rehabilitation counselor.  She also holds a master's degree in education.  (2399.)

1   record information about job openings on job order forms to describe

2   duties, hiring requirements, and related data.

3   (2399.)

### C.   Pre-Accident Medical Treatment

2004   Dating back to as early as 2004, Plaintiff had been treated medically for depression.  (*See* 1403.)[6]

02/23/2017   In an ADD screening test, Plaintiff indicated that the events that "very much describe[ him]" and which constitute "continuing problem[s]" for him were:  "Has difficulty getting and staying organized." "Forgetful. Misplaces items sometimes resulting in a frantic search." "Forgets tasks, why [he] walked into a room, or what [he] was about to say." "Has problems with time management." "Has trouble prioritizing." "Worries and obsesses." (2163-73.)  He indicated that his "[m]ain problems [include] . . . forgetfulness[, and] organizational skills/time management." (2174.)

02/23/2017   Dr. David E. Sosin, noted that "Pt [patient] is clearly ADD." in his office note.  (2122.)  The prescription medicine Adderall improved this condition at some point after his initial visit with Dr. Sosin.  (*See* 1403.)

### D.   Post-Accident Medical Treatment

07/14/2017   Plaintiff was involved in a motor vehicle accident.  A week after the accident, Plaintiff described the accident as follows:  He stopped for a pedestrian in a crosswalk and his car was rear-ended by another vehicle traveling at 25-30 miles per hour.  He was wearing his seatbelt but was thrown forward by the impact, and then back into the headrest.  He was

---

[6] This history is recounted by in the Medical Report of David E. Sosin, a psychiatrist who treated Meyer for Attention Deficit Disorder ("ADD"). (1403-06.)  Although an occasional phrase in Dr. Sosin's office notes can be deciphered, his treatment notes are almost completely illegible. Therefore, throughout this Order, the Court has relied on Dr. Sosin's summary.  (*Compare* 1403-04 *with* 2121-33.)

|   |   |   |
|---|---|---|
| | | dazed for a moment and his car was heavily damaged. (382 (Dr. Nanette Mitchell 07/21/2017 office notes).) The same day, Plaintiff's wife, Barbara Meyer, observed that Plaintiff twice lost his train of thought and "wasn't making sense." She took him to an urgent care facility. (1414.) |
| | 07/14/2021 | There, Plaintiff was seen by Dr. Sabrina C. Wilder, M.D., whose same-day assessment of Plaintiff indicated he suffered a "concussion, without LOC [loss of consciousness]." (364-378.) Plaintiff reported feeling disoriented, "scatterbrained," and losing his train of thought. (368.) Dr. Wilder noted that Plaintiff's "cervical back" showed a decreased range of motion, tenderness, pain and spasm. (370.) Her neurological assessment revealed Plaintiff was "alert," with "normal sensation, normal strength, normal reflexes and intact cranial nerves." (370.) Dr. Wilder observed no "cranial nerve deficit[s] or sensory deficit[s]" and noted that Plaintiff's "[g]ait [was] normal." (370.) |
| | 07/18/2017 | Dr. Sosin noted that Plaintiff "felt foggy, not remembering what he was saying by mid-sentence." (1403.) Dr. Sosin recommended he continue Adderall. (1403.) |
| | 07/20/2017 | Plaintiff went to the Hoag Memorial Hospital emergency room, complaining of "fogginess" and headache, and stating that "he has been losing his train of thought mid-sentence." Plaintiff stated "he was concerned about the possibility of a brain injury" based on his "persistent symptoms." (717.) CT scans of Plaintiff's head and cervical spine were not able to identify any problems. Plaintiff's primary diagnosis was identified as "[p]ost concussive syndrome." (720.) |
| | 07/21/2017 | Plaintiff saw his primary care physician, Dr. Mitchell, for a follow up regarding the accident. (379-91.) Dr. Mitchell diagnosed him with neck sprain and post-concussion syndrome. (379.) |
| | 07/27/2017 | Plaintiff followed up with Dr. Mitchell on July 27, 2017 and reported that |

his cognitive problems were impacting his ability to work.  (392-97.)
"He is having a hard time working. The last few days he has had
important meetings where he had to stop midsentence because he
couldn't remember what he was saying and his partner had to intervene."
(393.)   Plaintiff also reported some physical issues as a result of the
accident.  "He is having upper back and neck pain which persists at 3/10
and has left hand tingling." (393.)  Dr. Mitchell again noted Plaintiff's
diagnosis as "[p]ost concussion syndrome," advised him to take a leave
of absence from work, and noted he was to see a neurologist that same
day.  (394.)

07/27/2017   Plaintiff saw neurologist Victor Doan, M.D.  (709-12.)  Once again,
Plaintiff described his symptoms of cognitive dysfunction:  "Headache is
a band like sensation across the forehead and also in the base of the neck
3-4/10 intensity.  He has mental fogginess, memory difficulties, frequent
episodes of losing his train of thought and noticeable fatigue." (709.)
These mental problems were causing Plaintiff problems with his work.
"He is very concerned because during a presentation yesterday he
blanked out [without loss of consciousness] when speaking because he
forgot what to say next, and couldn't continue and needed his partner [to]
help." (709.)  Dr. Doan noted Plaintiff's "[s]ymptoms are typical of post
concussion syndrome." (710.)  Dr. Doan stated that the "vast majority"
of cases resolve within 3 months, and Plaintiff "is only 2 weeks from his
head injury so his recovery may still be on track." (710.)

08/08/2017   Dr. Mitchell noted Plaintiff's reports of "difficulty with focus and
expressive aphasia often losing his train of thought." (401.)

08/09/2017   Plaintiff underwent an Occupational Therapy Assessment.  (705-708.)
Plaintiff reported to Ms. Amy Salinas that he was continuing to perform
poorly at work due to his cognitive issues, such as "'blanking out' during

| | |
|---|---|
| | conversations with his clients." (706.)  Although Plaintiff's Montréal Cognitive Assessment ("MoCA")[7] showed a "normal" score, Salinas noted that it "may not have the sensitivity to capture the patient's short-term memory impairments."  Nevertheless, the MoCA showed "decreased detail with visuospatial/executive skills, decreased language skills and decreased ability to recall 5 words to remember after a delay." (706-07.) |
| 08/10/2017 | Dr. Sosin noted that Plaintiff's "[r]ecent memory and recall [were] still affected," and that Plaintiff "[b]ecomes sleepy after being busy." (1403.) |
| 08/25/2017 | Dr. Mitchell noted Plaintiff's reports of memory problems and losing his train of thought. (408-18.)  She stated: "He is trying to work but often blanks out after the concussion. He never did this before the concussion. He had 4 meetings Wednesday and he could not function without his partner. He would lose his train of thought." (411.) |
| 09/28/2017 | Dr. Sosin noted that "[b]rain fog continues and was worsened when patient ran out of Adderall." (1403.) |
| 11/03/2017 | Plaintiff was seen for pain from "injuries secondary to a motor vehicle accident that occurred on July 14, 2017." (112.) |
| 11/30/2017 | Dr. Mitchell advised Plaintiff to go on disability. (447-54.)  She noted: |

[7] In absence of objection by Unum, the Court takes judicial notice of the MoCA, which is attached Meyer's Opening Brief.  (*See* Doc. 35-1.)  The MoCA requires the patient to complete several simple drawing tasks and written tasks.  The first requires the patient to trace a simple connect-the-dots line through a series of A-E and 1-5 "dots" in a manner that alternates between letters and numbers: 1-A-2-B-3-C-4-D-5-E.  The patient must copy a simple cube drawing, draw a clock face showing the time at ten past eleven o'clock, and identify line drawings of three recognizable animals (each with a distinctive feature: a lion with a mane, a rhinoceros with its horns, and a camel with a hump).  The patient is asked to recall five words immediately after being read those words, then is asked to recall them again after five minutes.  The patient is asked to recall five one-digit numbers in sequence, and he is asked to recall three one-digit numbers in reverse.  The patient must tap in recognition of all "As" in a series of letters read to him, and subtract backwards from 100 by 7s (93, 86, 79, 72, and 65).  He must repeat two simple sentences that are read to him, he is asked to identify more than 10 words beginning with the letter "F" in one minute, and he is called upon to demonstrate the ability to understand simple abstract concepts: i.e., that trains and bicycles are both modes of transportation and that watches and rulers both measure things.  Finally, the test assesses six points of the patient's orientation:  date, month, year, day, place, and city.

Scott K Meyer is a 59 year old male who is here for follow up. He is seeing the neurologist and was on Lyrica and had to stop because he had swelling of both feet. His memory is very bad and his hand is still painful despite 3 epidurals. He can't sleep. He can't perform in meetings. He has 5/10 pain in his left hand. He needs to go on full time disability which he has at work.

(448.)  Dr. Mitchell wrote a letter regarding Plaintiff's disability:

To Whom it May Concern: Mr. Scott Meyer has been under my care from July 14, 2017 until the present time. He has been unable to earn a living during this time due to a severe post concussion syndrome with headaches, decreased mentation with memory loss and expressive aphasia, cognitive dysfunction, headaches and cervical disc protrusion with severe up to 9/10 left arm and hand pain despite physical therapy.

(452.)

12/13/2017   Plaintiff saw his pain management doctor, who noted Plaintiff rated his headache pain as "2 out of 10." (92.)

12/22/2017   Plaintiff saw neurologist Mohsin Shah, M.D., who diagnosed Plaintiff as having concussion and post-concussional syndrome. (96-103.) Dr. Shah performed a "mental status exam" of Plaintiff, describing Plaintiff as "irritable" with a "flat and sad" mood and affect, with "concentration . . . intact." (98.)

12/22/2017   Plaintiff's last day of work was December 22, 2017. (57.)

**E.    Plaintiff's Claim for LTD Benefits and Claim Approval**

12/22/2017   Plaintiff submitted a claim for LTD benefits. (57-62.) He identified his disabling medical conditions as post-concussive syndrome and cervical radiculopathy and the date of onset as the date of the accident. (57.) Plaintiff described the accident:

1
2
3
4
5
6
7
8
9

My car was at a standing stop waiting to turn into a restaurant parking lot, when I was hit from behind . . . at approximately 40 mph.[8]  I was thrown forward by the impact and thrown backward when my seat belt locked, causing me to hit the back of my head on the headrest in addition to the brain trauma when the seat belt locked.  I do not recall losing consciousness, but was disoriented and lost my train of thought when I spoke to my wife, who insisted on taking me to an urgent care center where I was diagnosed by a physician with all of the above.

10

(57.)  He described the job duties he was unable to perform as:

11
12
13
14
15
16
17
18

1. Unable to lead executive search assignments, due to short-term memory problems[;] can't interview and compare/contrast candidates for skills critical to the position; can't recall major strengths/weaknesses of candidates throughout search process when providing client updates[.]  2. Unable to effectively sell/conduct business development with prospective client companies due to frequent loss of train of thought, brain fog, [and] impaired short-term memory.

19

(57.)

20

12/19/17

Dr. Mitchell completed an Unum Attending Physician Statement ("APS").  (72-75.)  Dr. Mitchell identified "the primary diagnosis that may impact [her] patient's functional capacity" as "postconcussion [syndrome] after head trauma," "expressive aphasia," "intermittent memory loss," "severe headaches," "left hand pain and radiculopathy [from] cervical disc disease."  (72.)  Dr. Mitchell identified Plaintiff's restrictions and limitations ("R&Ls") as being "unable to keep a train of

27
28

_____

[8] The estimates of the speed of the car that rear-ended Meyer range from 25 to 40 mph.  Meyer reportedly estimated the car's speed at 25-35 mph on the day of the accident.

| | | |
|---|---|---|
| 1 | | thought to be effective in interviewing candidate[s] and selling his |
| 2 | | services to client[s; he] has episodes of confusion [and is] unable to |
| 3 | | focus[; he has] sleep deprivations due to ongoing cervical neck disc |
| 4 | | disease with hand pain." (73.) |
| 5 | 01/11/2018 | While Plaintiff's claim was pending, he underwent electromyography |
| 6 | | ("EMG") testing to determine if his hand pain was due to carpel tunnel |
| 7 | | syndrome or cervical radiculopathy. (659-60.) The EMG found but no |
| 8 | | evidence "to suggest a motor cervical radiculopathy." (660) |
| 9 | 02/02/2018 | In an email to Unum's claims examiner, Samantha Lee, on behalf of |
| 10 | | Plaintiff's employer, clarified Plaintiff's compensation structure and his |
| 11 | | performance after the accident. (253-54.) Plaintiff's compensation was |
| 12 | | 100% performance based, and he was paid when he closed "deals." (*See* |
| 13 | | 254 ("Scott is responsible for doing the work to bring in the deals and if |
| 14 | | he doesn't bring in deals, he doesn't get paid.").) Lee stated that most |
| 15 | | compensation received by Plaintiff after the accident was for deals closed |
| 16 | | in the first and second quarter of the year, before the accident. (253.) |
| 17 | | The remainder was for deals where the work after the accident was |
| 18 | | performed not by Plaintiff but by a partner with whom he was working. |
| 19 | | (253.) |
| 20 | 02/06/2018 | Consistent with Plaintiff's EMG testing, Dr. Mitchell's office notes |
| 21 | | indicate, *inter alia*, that Plaintiff was diagnosed with bilateral carpal |
| 22 | | tunnel syndrome. (471.) |
| 23 | 02/21/2018 | Dr. Sosin noted that Plaintiff's "[b]rain fog [is] unchanged." (1403.) |
| 24 | 02/26/2018 | Several Unum employees discussed Plaintiff's claim. (587.) They |
| 25 | | contrasted Plaintiff's subjective complaints of cognitive dysfunction and |
| 26 | | expressive aphasia both with his within-normal-limits brain MRI from |
| 27 | | November 17, 2017, and with several doctors' notes of Plaintiff's within- |
| 28 | | normal-limits cognitive ability, alertness and orientation, and recall. |

|   |   |   |
|---|---|---|

(587.)  Unum's claim personnel questioned the lack of "formal cognitive testing," which they would expect where he reported "his cognitive dysfunction to be so debilitating."  (587.)  The team recommended obtaining any available testing results and inquiring further into any treatment plan for the claimed cognitive dysfunction.  (587.)

03/09/2018  Unum approved Plaintiff's claim, effective October 13, 2017, based on his carpal tunnel syndrome.  (814-21.)  Unum stated: "because you are unable to perform work activity that required frequent use of your hands due to your medical condition of carpel tunnel syndrome." (816.)  Unum denied the claim based on Plaintiff's cognitive dysfunction:  "We do not have sufficient information to support your claim for post-concussion syndrome. The brain MRI was unremarkable, and you have had no formal testing to document your claimed memory deficits." (816.)

04/10/2018  Dr. Sosin noted that Plaintiff was "[s]till unable to work on Adderall 30 mg." (1403.)

04/11/2018  Plaintiff emailed Unum's claims examiner.  (862-63.)  He stated that he was "fairly well recovered from the carpel tunnel surgery on my left hand," and added that, as a result of the surgery, his left hand pain "has pretty much been eliminated." (862.)  He reported improvement in his ability to sleep well, which he noted "is what every doctor I've seen has told me is the most important thing to do to recover from post-concussive syndrome." (862.)  Plaintiff also conveyed that his cognitive function had not improved, and that he was still experiencing "short-term memory loss, losing [his] train of thought frequently every day, 'brain fog' and not being able to find the right word when speaking." (862.)  Plaintiff reported that setting up the cognitive testing was "a very slow process." (862.)  He sought additional information regarding whether neuropsychology testing would necessarily include tests related to tactile

|   |   |   |
|---|---|---|
| 1 | | perception and academic ability and achievement, which could |
| 2 | | dramatically change the cost of the testing, and which might not be |
| 3 | | covered by his medical insurance.  (863.)  Moreover, Plaintiff provided a |
| 4 | | list of twelve areas of neuropsychological testing and asked which |
| 5 | | categories would be relevant to Unum's medical review of his claim. |
| 6 | | (862-63.) |
| 7 | 04/17/2018 | A note from Unum's file indicates Jana Zimmerman, Ph.D., a |
| 8 | | psychologist employed by Unum, was asked to opine whether |
| 9 | | "[n]europsych testing [was] needed."  (890.)  Dr. Zimmerman reportedly |
| 10 | | concluded that "no neuropsych testing is needed at this time," because |
| 11 | | Plaintiff was "past the 3 month recovery time for [traumatic brain injury] |
| 12 | | and no cognitive deficits would be expected."  (890.)  She further |
| 13 | | reportedly opined that "[i]f [Plaintiff's] providers feel he has cognitive |
| 14 | | deficits that would affect his ability to work, they could refer him for |
| 15 | | testing, but we would not recommend any at this time."  (890.)  Dr. |
| 16 | | Zimmerman was influenced by Plaintiff's April 11, 2018 email to Unum, |
| 17 | | which she found to "show[] higher-level thinking skills" that were |
| 18 | | inconsistent "with any type of cognitive deficit."  (890.) |
| 19 | 05/02/2018 | Unum's claims examiner/Benefits Specialist informed Plaintiff by email |
| 20 | | that Unum would not need neuropsychological testing for its "on-going |
| 21 | | claim review," and that Unum would "just need [his] updated medical |
| 22 | | records and ongoing work restrictions." (921.) |
| 23 | 05/04/2018 | Unum sought and obtained a statement from Plaintiff's employer.  (961- |
| 24 | | 63.)  In describing changes after the accident, his employer, again |
| 25 | | through Samantha Lee, explained the following and offered an example |
| 26 | | |
| 27 | | |
| 28 | | |

of how Plaintiff's performance was found unsatisfactory of one of the firm's clients:

> There was a noticeable difference in Scott especially in the speed at which he could communicate ideas and strategy when leading a search.  His memory loss interfered with his ability to sell our service in meetings with potential clients and this severely affected not only his practice as he wasn't able to bring in as much business, but also his partnerships internally with the recruiters, researchers, and Search Consultants he was partnering with on search assignments. . . . [T]he accident severely affected Scott's job performance.  The short-term memory loss affected his ability to effectively sell our services to potential clients.  He would often have to bring another Search Consultant with him on those meetings and rely heavily on them to finish his thoughts when he would lose track mid-sentence of his pitch. . . . [A]bout a month after the  accident, . . . the client told our CEO that he noticed a difference in Scott and expressed concern about the search moving forward due to the pace slowing down considerably since his accident.  This is when our CEO realized that Scott wasn't just having difficulty with business development, . . . but [also] in actually running search assignments, . . . and spoke to him about LTD.  Our CEO took over the search in order to appease our client.

(961 (paragraph structure altered).)

### F.    Medical Treatment After Claim Approval and During Continuing Claims Review

05/11/2018   Plaintiff had CTS release surgery on his right hand.  (989.)

05/11/2018   Dr. Mitchell's office notes indicate that Plaintiff was "still having difficulty finding words, lack of concentration, lapse of memory

| | |
|---|---|
| | especially short term.  He can't remember what he is saying while talking." (1717.) |
| 05/17/2018 | Dr. Sosin noted "[n]o improvement in memory.  Unaware of passage of time.  Perseverates on tasks." (1403.) |
| 05/18/2018 | Dr. Mitchell responded to Unum's inquiry, indicating that Plaintiff remained disabled due to his cognitive difficulties. (999.) |
| 06/19/2018 | Plaintiff's hand surgeon, Dr. Grant Robicheaux, indicated Plaintiff had the R&L of no prolonged keyboarding for another six weeks.  (1029.) |
| 06/21/2018 | Dr. Sosin noted that Plaintiff "[r]eports that depression is a new symptom." (1403.) |
| 07/05/2018 | Dr. Mitchell's office notes indicate Plaintiff "has continued cognitive dysfunction with short term memory loss.  Episodes of confusion and expressive aphasia, constant headache persists.  He has difficulty with time management and understanding of time passage." (1135.) |
| 08/02/2018 | After Dr. Robicheaux's keyboarding restriction expired, Unum sought updated information and claim forms to allow Unum to evaluate whether Plaintiff remained disabled under the terms of the Policy.  (1073-1076.) |
| 08/06/2018 | Unum contacted Plaintiff by telephone to check his recovery after his hand surgery.  (1088.)  During this call, Plaintiff stated that he believed he was still unable to work due to his cognitive problems.  (1088.) |
| 08/07/2018 | An application for Social Security Disability Insurance ("SSDI") benefits, was submitted on Plaintiff's behalf.  (1102.) |
| 08/29/2018 | James Folkening, M.D., an internist hired by Unum, participated in a group discussion concerning Plaintiff's claim.  The team concluded that the R&L's specified by Dr. Mitchell were inconsistent with Plaintiff's ability to manage his household finances, drive a car, and author the email referred to above.  (1158.) |
| 09/04/2018 | Dr. Mitchell responded to a letter from Unum, again opining that Plaintiff |

continued to be disabled based on "persistent symptoms of expressive aphasia, headache, loss of memory[, and] post-concussion syndrome." (1177-78.)

09/24/2018  Dr. Folkening conducted a file review.  (1227-32.)  He concluded that the R&Ls identified by Dr. Mitchell were not supported by the information in the records.  (1228.)  Dr. Folkening noted the disconnect between the nature of the relatively minor accident and the severe, lengthy impairment reported by Plaintiff:

> Accounts of the MVA that occurred at the [date of disability] do not suggest that the claimant sustained a serious closed head injury that would characteristically be associated with more severe or protracted cognitive complaints. . . . Airbags did not deploy, and there was no alteration of consciousness, though the claimant reported some temporary feeling of disorientation.  Evaluation . . . on the day of the accident revealed no evidence of serious injury. Apart from some tenderness, stiffness, and spasm of paracervical musculature, physical and mental status exam findings were unremarkable.  [At the] emergency department evaluation on 7/20/17, continuing problems with fatigue, mental fogginess, and loss of train of thought during conversations were described.  Once again, excepting some minimal cervical spine tenderness, physical and mental status exam findings were normal.  CT of the brain was unremarkable.

(1228-29 (paragraph structure altered).)  Dr. Folkening summarized his findings and opinions in part, as follows:

> Over the last fourteen months, the claimant has continued to describe functionally impairing cognitive function, though with no consistent documentation of serious compromise of cognitive

function by any provider excepting Dr. Mitchell.  There has been no arrangement for more formal and comprehensive neurocognitive testing.  Most recently dated treatment notes from various providers fail to confirm cognitive deficits precluding claimant performance of full-time sedentary activity as described. (1229.)  Dr. Folkening relied on Plaintiff's MoCA results in concluding Plaintiff suffered from no "major" cognitive impairment.  (1229.)  Dr. Folkening also addressed Plaintiff's status post-bilateral CTS surgery: "there is no reason to conclude from most recently dated records that the claimant currently remains impaired from upper extremity pathology or related surgery." (1230.)  Additionally, Dr. Folkening addressed Plaintiff's complaints of headaches and noted that "no new prescription medication was provided" to treat headaches following the accident, CT examination of the brain and brain MRI (in July and November 2017, respectively) were "unremarkable," and by December 2017 Plaintiff was reporting the intensity of his headache pain as only "2/10."  (1230.) Dr. Folkening also noted that while Dr. Mitchell's subsequent records "continue to cite unrelenting severe headaches, [they] do not suggest any additional diagnostics, referrals, or use of prescription medication for relief," and Plaintiff "has not asserted that headache pain is a significant factor in limiting functionality in most recent months."  (1230.)

09/24/2018  Dr. John Coughlin, an internist,[9] also reviewed Plaintiff's file.  (1234-37.) He agreed with Dr. Folkening's conclusion that Dr. Mitchell's R&Ls

---

[9] Dr. Coughlin is an endocrinologist, but his specialty is not relevant to Meyer's case.  According to the American Medical Association, "[e]ndocrinology is the specialty of medicine that deals with the problems, diseases and medical conditions of the endocrine system."  *See* https://freida.ama-assn.org/specialty/endocrinology-diabetes-and-metabolism-im (last accessed Mar. 10, 2021). Endocrinologists are "internists who concentrates on disorders of the internal (endocrine) glands." *Id.*  They "typically evaluate, diagnose and treat people with diabetes, thyroid disease, osteoporosis, infertility, and disorders of the pituitary and adrenal glands, as well as diseases that can affect growth, development and metabolism."  *Id.*

were not supported.   (1236.)  Like Dr. Folkening, Dr. Coughlin also noted that "the level of current intervention is inconsistent with the severity of complaints" and the lack of objective testing to support Plaintiff's subjective complaints.  (1236.)  Further, Dr. Coughlin found significant that although Dr. Mitchell reported in her office note dated July 5, 2018 that Plaintiff was "seeing the specialist and neurologist" for short-term memory loss, there were no records that corroborated any such contemporaneous evaluation or treatment. (1236.)  Dr. Coughlin also relied on Plaintiff's MoCA test results.  (1236.)

09/28/2018   Dr. Sosin noted that Plaintiff was "impaired and unable to perform his usual work activities," despite "some improvement in energy and brain fog."  (1404.)

10/05/2018   Unum notified Plaintiff that that it was terminating his LTD benefits. (1246-54.)  Unum noted that the accident was not serious; Plaintiff was not seriously injured on the day of the accident and suffered no loss of consciousness; although Plaintiff complained of headaches, no additional treatment was ordered and no medication was prescribed; although Plaintiff complained repeatedly of cognitive dysfunction, no neuropsychological testing was ordered or otherwise undertaken; Plaintiff failed to pursue occupational therapy; and the only objective test, the MoCA, was within normal limits.  (1248.) Therefore, Unum concluded that as of October 5, 2018, Plaintiff no longer met the definition of disability under the Policy.  (1247.)

11/17/2018   As part of Plaintiff's application for SSDI, Halimah McGee, Ph.D, psychologist, administered three tests to Plaintiff:  The Trail-Making Tests (Parts A and B), the Wechsler Adult Intelligence Scale-IV (WAIS-IV), and the Wechsler Memory Scale-IV (WMS-IV).  (2324-30.)  Dr. McGee reported the test results and concluded that they showed that,

while Plaintiff could probably perform a job requiring repetitive skills, he could not perform a job requiring higher level functioning:

> The claimant displays cognitive limitations regarding his ability to work in that he displays mild deficits in attention and concentration on certain types of tests (per Trails A).  Although this claimant is capable of learning a routine, repetitive skill, he would probably have difficulty functioning in a regular job setting, if he were required to work under time constraints or multitask.

(2329 (paragraph structure altered).)

12/13/2018   Dr. Sosin noted that Plaintiff still had "problems gauging passage of time," and was unable to tell whether "a particular activity took place two weeks ago or two months ago." (1404.)  Dr. Sosin reported that prior to the accident, Plaintiff was not prevented by either headaches or ADD from performing his work duties at a high level. (1404.)

## G. Plaintiff's Unsuccessful Appeal of Unum's Decision to Close the Plaintiff's Claim

Thereafter, Plaintiff (through his attorney) appealed Unum's claim decision and submitted the additional materials described below. (1291-1418.)

03/05/2019   Dr. Jane E. Lewis, Ph.D., psychologist, administered a number of psychological tests and gave a detailed assessment. (1353-68.)  From these tests, Dr. Lewis made the conclusion that Plaintiff was disabled from his regular occupation and any similar occupations. (1368.)  Significantly, regarding the reliability of the testing and her conclusion drawn therefrom, Dr. Lewis repeatedly noted that Plaintiff passed all symptom validity measures that are built into those tests. (1359 (noting that Plaintiff "appeared to be putting forth his best efforts, which is supported by his passing all symptom validity measures"); 1367 ("[T]here is no evidence to indicate that Mr. Meyer was not putting forth

optimal effort or that he was attempting to exaggerate cognitive functioning deficits."); 1368 ("Mr. Meyer passed symptom validity measures, thus, showing he was putting forth adequate effort on the testing.").)  Dr. Lewis stated her conclusion regarding disability:

> Mr. Meyer's occupation of Principal Consultant requires strong communication skills including the ability to interact intelligently and meaningfully with high level executives, the ability to express himself articulately and to attend to details expressed in meetings, to conduct research and to make abstract analyses, to adhere to deadlines, to manage time effectively, to plan and organize aspects of his business, to effectively multi-task among meetings and clients, and to attend to and retain new information over time. The deficits that have been discussed in this report would make it impossible for Mr. Meyer to be able to perform not only the duties of a Principal Consultant, but also any occupation.  Thus, he is disabled at this time as a result of the cognitive functioning deficits.

(1638.)  As to Plaintiff's baseline pre-accident cognitive abilities, in addition to relying on Plaintiff's representations regarding his early academic abilities as represented by SAT and GMAT 94th to 96th percentile scores, Dr. Lewis tested Plaintiff on an area that tends to survive brain injury, word comprehension.  (1353, 1361.)  Plaintiff scored in the 95th percentile.  Dr. Lewis noted:

> [T]asks comprising the Verbal Comprehension measure tend to remain the most robust in the face of most types of cognitive functioning deficits, such as those sustained in a motor vehicle accident. As a result[,] these tasks tend to be good predictors of premorbid intellect, and, thus, are consistent with this examiner's

interpretation of pre-morbid intellect being very high, in the Superior to Very Superior range.

(1361.)

03/07/2019   Vocational Rehabilitation Counselor Galarraga performed a labor market survey regarding Plaintiff's occupation and similar occupations. (1370-99.)  Based thereon, Galarraga concluded that Plaintiff could not perform the duties of his own occupation or any related occupation.  (1395.) Galarraga's survey included eleven employers within 50 miles of Plaintiff's address that were questioned regarding employment based on Plaintiff's stated limitations of slowed processing speeds, short-term attention, issues with memory and inattention, difficulty finding the proper words, and inability to recall newly learned information.  (1395.)

03/11/2019   Dr. Mitchell wrote a letter again expressing her opinion that Plaintiff was totally disabled and unable to perform his regular occupation due to post-concussion syndrome, short-term memory difficulties, and expressive aphasia.  (1401.)  Dr. Mitchell noted her role as Plaintiff's primary care physician since 2010, both before and after the accident, which gave her the ability to analyze Plaintiff's pre- and post-accident medical records.

03/28/2019   Dr. Sosin authored a comprehensive report of his treatment of Plaintiff. (1402-06.)  At the time, Dr. Sosin understood Plaintiff's occupation as "working as a high-level consultant for a firm that placed CEOs and other executives in new positions." (1402.)  His report reviewed his treatment of Plaintiff both before and after the accident. He acknowledged that Plaintiff's ADD symptoms could overlap somewhat with symptoms of post-concussion syndrome, but also noted that there was "a clear differentiation" between the two in Plaintiff's case.  (1405.)  Dr. Sosin remarked that Unum's claims reviewers assumed, contrary to more current research reviewed by Dr. Sosin, that minor head trauma, without

loss of consciousness, can cause severe cognitive impairment.  (*See* 1404-05 ("[T]he severity of head injury does not necessarily correlate with subsequent cognitive impairment.  For instance, there are many cases where a seemingly minor head trauma has produced major cognitive impairment.").)  Therefore, based on his forty years of experience treating patients as a headache specialist, his pre-accident ADD testing of Plaintiff, his treatment of Plaintiff both before and after the accident, a review of relevant medical literature, a review of Dr. McGee's report, and a review of Dr. Lewis's report, Dr. Sosin concluded that "Meyer is totally disabled and unable to perform the substantial and material duties of Principal Consultant based on post-concussive syndrome caused by auto accident on 07/14/2017."  (1406.)

06/07/2019   Plaintiff's request for reconsideration of his claim for SSDI benefits was denied by the Social Security Administration ("SSA"). (2032-34.)  The SSA explained:

> You said that you are unable to work because of post concussive syndrome, carpal tunnel syndrome, hypertension, and ADD.  The medical evidence shows that you have some limitations caused by your health problems.  We realize that your condition prevents you from doing any of your past jobs, but it does not prevent you from doing other jobs, which require less physical effort.  Based on your age, 61, education, 16 years, and past work experience, you can do other work.

(2034.)

06/27/2019   Jacqueline Crawford, M.D., a neurologist, reviewed the file on Unum's behalf.  (2071-74.)  She opined that Plaintiff's symptoms were not consistent with his injury; specifically, she opined that Plaintiff's reported expressive "'aphasia' exceed[ed] in duration and severity what

would be anticipated in light of the mechanism of injury, normal neurological examinations in July 2017, and normal imaging." (2072.) On the ultimate question of whether Plaintiff was "limited from . . . influencing people in their opinions, attitudes, and judgments; directing, controlling or planning activities of others; and making judgment and decisions," Dr. Crawford first "[d]eferred to Dr. Brown" but nevertheless thereafter gave an opinion. (2072-73.) She stated:

> "Expressive Aphasia" due to traumatic brain injury is not supported as of 10/5/18 and beyond. . . . Neurological deficits are maximal in the hours and days after a brain injury, yet the insured did not demonstrate evidence of aphasia on his examinations during that timeframe: "He is not agitated and not disoriented. He displays no tremor, normal speech and normal reflexes. No cranial nerve deficit or sensory deficit." (Wilder 07/14/17). "Awake and alert. No aphasia or dysarthria." (Muir/neuro/Hoag Memorial 07/20/17). The insured's brain imaging by CT and MRI did not reveal evidence of hematoma, cerebral edema, stroke, hydrocephalus, or axonal disruption as might be seen in an individual reporting atypical severe or long-lasting neurological deficits such as aphasia.

(2073 (paragraph structure altered).) Dr. Crawford noted the absence of a referral of Plaintiff to a neurologist, as one might expect "if his providers were concerned that Plaintiff suffered from a physical condition causing aphasia." (2074.) Additionally, Dr. Crawford referred to Plaintiff's written correspondence of record, "demonstrate[ing] excellent [use of vocabulary, grammar, and spelling in a manner inconsistent with expressive aphasia." (2074.) Although Dr. Crawford noted the availability of Dr. Lewis's neuropsychology report and raw test data, she

1    does not comment on it.  (*See* 2071.)

2    07/29/2019   William Black, Ph.D., a neuropsychologist, performed a file review

3    Unum.  (2350-52.)  He was asked by Unum to provide an opinion

4    regarding two questions:  "What cognitive function is demonstrated in

5    the neuropsychological testing?" and "What . . . psychological facts are

6    recognized" therein?  (2350.)  In answering the first question, Dr. Black

7    acknowledged that, as to the test data developed by both Dr. McGee and

8    Dr. Lewis, "the cognitive test data are valid and are an accurate

9    representation of [Plaintiff's] current cognitive performance."  (2350-51.)

10    Nevertheless, Dr. Black disagreed with Dr. Lewis's assessment by first

11    questioning her assumptions regarding Plaintiff's baseline, pre-accident

12    cognitive functioning level.  (2351.)  Instead, Dr. Black made an

13    assumption "[u]sing standard statistical estimation methods" to estimate

14    that level as "within the High-Average/Superior Range," which was

15    lower than Dr. Lewis's estimate of "Superior" to "Very Superior" range.

16    (2351 (Dr. Black); *cf.* 1361 (Dr. Lewis).)  Nevertheless, even with the

17    lowered baseline assumption, Dr. Black still noted that the test results

18    were lower than would be expected.  Specifically, he noted that

19    Plaintiff's "Basic and Active Manipulative Attention are mildly

20    abnormal," but that "[a]ll other cognitive performance is within the broad

21    range of normal, with greater than expected degrees of variability among

22    the tests/subtests."  (2352.)  Dr. Black noted that, as compared with

23    Plaintiff's "statistically estimated probable premorbid functioning,"

24    Plaintiff's "scores [were] relatively lower than predicted in many

25    domains, primarily Attention, aspects of Learning and Memory,

26    Processing Speed, and aspects of Executive Functioning."  (2351.)  As to

27    the second question, Dr. Black opined that Plaintiff's psychological tests

28    were valid and the abnormal results related to depression and somatic

24

|    |            |                                                                                 |
|----|------------|---------------------------------------------------------------------------------|

concerns were likely related to an adjustment disorder rather than any disabling condition. (2352.)

08/05/2019    The file was then referred to UNUM's Dr. Peter Brown, a psychiatrist. (2363-65.) Dr. Brown opined that Plaintiff was not precluded from an occupation that required "dealing with people, . . . influencing people in their opinions, attitudes, and judgments; directing, controlling, or planning activities of others; and making judgments and decisions." (2364.) Dr. Brown relied on Dr. Black's conclusion that the "[t]esting results indicate, at most, mild impairment." (2364.) Dr. Brown believed that Plaintiff's cognitive impairments were due to an exacerbation of his preexisting chronic psychiatric condition, presumably ADD, and that this condition would "benefit from on-going treatment." (2364.) Although noting that "[i]ndividuals with a long-standing psychiatric condition have a significantly higher risk of having persistent cognitive, affective and somatic symptoms after a comparatively mild head injur[y]," Dr. Brown also opined that "there is no evidence of related current functional impairment that would preclude sustaining full-time occupational capacity." (2364.)

08/28/2019    UNUM denied Plaintiff's appeal, echoing the rationales set forth in Dr. Black's and Dr. Brown's file reviews. (2409-17.) UNUM noted that Plaintiff had mildly abnormal measures of attention, learning, memory, processing speed, and aspects of executive functions, but that "all other cognitive performances fell within the broad range of normal." (2414.) Unum also pointed out that Plaintiff's "reported symptoms were . . . inconsistent with the natural progression of a mild head injury." (2414.) Unum concluded that Plaintiff "was no longer limited from performing, with reasonable continuity, the substantial and material acts necessary to pursue his usual occupation beyond October 5, 2018." (2414.)

| | |
|---|---|
| 09/10/2019 | Plaintiff filed the present action. |
| 09/29/2020 | The SSA issued a fully favorable decision, awarding Plaintiff SSDI |

benefits.  (*See* Doc. 42, Mot. to Admit Extrinsic Evid., Ex. A ("SSA Award").)  The SSA found that Plaintiff "experienced physical and cognitive changes after his accident," including "problems with memory lapses, word finding difficulty, and lack of concentration."  (*Id.* at 18.)  It determined that Plaintiff retained the "residual functional capacity . . . to [perform] sedentary work that involves simple and repetitive tasks."  (*Id.* at 19.)  The SSA found that Plaintiff was "unable to perform any past relevant work," including his work as a "personnel recruiter," specifically finding that "[t]he demands of [Plaintiff's] past relevant work exceed [his] residual functional capacity."  (*Id.* at 20.)  Therefore, the SSA concluded that Plaintiff had been disabled within the relevant provisions of the Social Security Act beginning December 22, 2017.  (*Id.* at 21.)

## II.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure Rule 52

This matter is properly before the Court pursuant to Federal Rule of Civil Procedure 52.  Rule 52 motions for judgment are "bench trial[s] on the record," and the Court "make[s] findings of fact under Federal Rule of Civil Procedure 52(a)." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (*en banc*).  "In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true."  *Id.* The parties' briefs do not reference Rule 52; nevertheless, the Court construes the parties' briefs as cross-motions for judgment pursuant to Rule 52.  (*See* Doc. 19, Scheduling Order at 1 ("[T]he parties should file cross-motions for judgment pursuant to Federal Rule Civil Procedure 52 on the briefing schedule set forth below.").)

### B.   Standard of Review

The Court has adopted the parties' stipulation that the decision of the ERISA

plan administrator to terminate Plaintiff's LTD benefits is subject to *de novo* review. (Doc. 24-25.)  Under a *de novo* standard of review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  That is, the Court "determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).

### C.    Burden of Proof

Plaintiff bears the burden of establishing by a preponderance of the evidence his entitlement to benefits (*i.e.*, that he was disabled under the terms of the Policy during the relevant claim period).  *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016); *Muniz*, 623 F.3d at 1294.  To do so, Plaintiff must establish that he was more likely than not "disabled" under the terms of the LTD Policy at the time his benefits were terminated.  *See, e.g., Hart v. Unum Life Ins. Co. of Am.*, 253 F. Supp. 3d 1053, 1074 (N.D. Cal. 2017); *Porco v. Prudential Ins. Co. of Am.*, 682 F. Supp. 2d 1057, 1080 (C.D. Cal. 2010).

### D.    Evidence Considered by the Court

The Court generally limits its review to "the evidence that was before the plan administrator at the time [the] determination [was made]."  *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007).  However, evidence outside the administrative record may be considered in "certain limited circumstances" where additional evidence is necessary to conduct an adequate de novo review of the benefit decision.  *Id.*

Here, the Court has already granted the Motion to Admit the September 29, 2020 Decision of Administrative Law Judge Paul Coulter, which the Court has considered.  (*See* Docs. 42, 46.)

Moreover, as set forth *supra* note 8, in the absence of objection thereto, the Court takes judicial notice of the contents of the MoCA in order to give meaning to

the significance of Plaintiff's low-normal score on this particular cognitive test.

Evidence before the Court need not be admissible under the Federal Rules of Evidence; instead, it "may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability." *See Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).

### E.    Analyzing Medical Evidence

A mere diagnosis is not dispositive of the issue of disability. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability. . . . A claimant bears the burden of proving that an impairment is disabling") (internal quotation marks and citation omitted).

In performing a *de novo* review, the Court is not required to accept the conclusion of any particular treatment provider or medical file review.  For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Instead, medical opinions "must . . . be accorded whatever weight they merit." *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing *Nord*).

The Court may give greater weight to a treating physician's opinion where it is evident a particular physician has had "a greater opportunity to know and observe the patient than a physician retained by the plan administrator" who conducts a file review.  *Id.* (internal quotation marks omitted).  However, where a treating physician lacks expertise in a particular area, and the plan's retained expert is a specialist in that area, it may be appropriate for a court to give greater weight to the specialist who merely conducts a file review.  *See Nord*, 538 U.S. at 832.

Moreover, in cases such as this one, courts have noted an apparent tension between treating physicians, who may tend to favor an opinion of "disabled" in a close case, and physicians who are routinely hired by plan administrators, who may favor a finding of "not disabled" in the same case.  *See id.*  It is therefore incumbent

upon the Court to carefully assess and weigh all the evidence in light of the issues before the Court.

## III.   FINDINGS OF FACT

On the evidence of record summarized above, and in light of the relevant legal standards set forth above, the Court makes the following findings of fact.

### A.   The Material and Substantial Duties of Plaintiff's Regular Occupation

Based on vocational consultants Galarraga's and Marisano's descriptions of Plaintiff's regular occupation, the emails from Samantha Lee in response to Unum (253-54, 961-63), and Plaintiff's own statement (1412-13), the Court finds that the "material and substantial duties" of Plaintiff's "regular occupation" include the following:

Plaintiff's regular occupation requires near-constant mental focus.  It requires attention to detail, the ability to manage time effectively, and the ability to multitask.

Plaintiff's regular occupation also requires several components of higher cognitive functioning, including short- and long-term memory and analytical skills. Plaintiff was routinely required to take in new information about positions and candidates, and to retain and analyze that information to evaluate the candidates' suitability for open positions.

Plaintiff's regular occupation requires strong communication skills, including the ability to confidently express himself verbally and in writing, to quickly understand and use both language and subtle communication cues to gain and retain the confidence of both the employer-client and executive candidates.

Plaintiff's regular occupation requires that he be capable of developing and maintaining relationships with both sides of a potential match of employer and candidate.

To perform his regular occupation effectively, Plaintiff needed to combine all these skills to sell his services to parties on both sides of a transaction, thus making a

successful match between high-level candidates for executive positions and prospective employers looking to find new leaders.  To do this, Plaintiff was regularly called upon to influence the opinions, attitudes, and judgments of others.

**B.     Plaintiff Was Able to Perform the Material and Substantial Duties of His Regular Occupation Before the Accident But Not After the Accident**

Plaintiff performed his regular occupation successfully before the accident, but he was unable to perform his regular occupation successfully after the accident. Plaintiff and his employer—the only two parties in a position to assess this fact— agree on this point.

Unum's criticism of the ability of Samantha Lee, McDermott & Bull's Controller, to speak to this point comes too late.  (See Def. Resp. Br. at 16-17.)  Unum did not seek additional information from any other source at McDermott & Bull, nor did it otherwise indicate that Plaintiff should provide any additional employer statement.  For instance, Lee clearly relays information obtained from McDermott & Bull's CEO regarding a specific example of Plaintiff's deficient performance after the accident.  (961.)  There is no indication that Unum was unwilling to accept Lee's account at face value, and had the second-hand nature of this example been of concern to Unum, it could have (but did not) seek confirmation from its original source.

Moreover, to the extent that Unum's criticism is based on the lack of foundation (or the hearsay foundation) of Lee's statements, such criticism is misplaced in a case involving administrative review under ERISA of a decision to deny benefits.  Unum no doubt relies on such statements all the time in its claims decisions, and the Court's role here is to determine whether "the plan administrator correctly or incorrectly denied benefits."  *Abatie*, 458 F.3d at 963.  And before the Court in this proceeding, evidence need not be admissible under the Federal Rules of Evidence, it need only be "relevant, probative, and bear[] a satisfactory indicia of reliability."  *Tremain*, 196 F.3d at 978.  Here, Lee's emails are detailed and clearly based on consultation with

others within the organization regarding Plaintiff's post-accident performance versus his pre-accident performance.  As such, they are "relevant, probative, and bear[] a satisfactory indicia of reliability."  *Id.*  The Court credits them as the statements of Plaintiff's employer.

In any event, Lee observed first-hand the difference in Plaintiff after his accident.  (*E.g.*, 961 ("I used to work closely with Scott as a Researcher on the recruiting team before I moved into my current position as Controller."); *id.* ("After the accident, I could tell the difference even when we were talking about simple transactional topics.").)  On this point, the Court gives great weight to Lee's first-hand account of working with Plaintiff before and after the accident.

### C. The Medical Evidence Establishes Plaintiff is Unable to Perform the Material and Substantial Duties of His Regular Occupation Due to Reported and Measurable Cognitive Deficits

The medical evidence establishes that Plaintiff more likely than not continues to suffer from post-accident deficits in the types of cognitive functioning required to perform his regular occupation, that is, it establishes that he is "disabled" within the meaning of the Policy.  Plaintiff has established he is disabled through his own subjective accounts (as set forth in his doctors' notes, his wife's statement, and his own statement) and through the valid results of objective neuro-psychological testing that are consistent with his subjective accounts of his symptoms.

Specifically, as to Plaintiff's subjective complaints, on the day of the accident, Plaintiff described feeling disoriented, "scatterbrained," and losing his train of thought.  (368.)  In her statement, Plaintiff's wife reported Plaintiff "wasn't making sense," leading her to take him to seek treatment at an urgent care center the evening of the accident.  (1414.)  Four days post-accident he reported feeling "foggy" and "not remembering what he was saying by mid-sentence."  (1403.)  A week post-accident, Plaintiff had symptoms severe enough to seek treatment again, this time going the emergency room of a hospital, complaining of persistent "fogginess," headaches, and

"losing his train of thought mid-sentence." (717.)

Two weeks post-accident, at a second follow-up visit with his primary care physician, Plaintiff reported trouble working, specifically reporting not remembering what he was saying when he was mid-sentence. (393.) The same day, Plaintiff echoed these complaints to neurologist Victor Doan, M.D., who noted Plaintiff's reports of "mental fogginess, memory difficulties, frequent episodes of losing his train of thought and noticeable fatigue." (709.) Plaintiff continued to complain regarding lost focus, trouble with work, and losing his train of thought for two months that followed. (*See, e.g.*, 401 ("difficulty with focus and expressive aphasia often losing his train of thought"); 707 (continuing to perform poorly at work due to his cognitive issues; unable to remember the details of a meeting he had just attended); 1403 "[r]ecent memory and recall . . . still affected"); 411 ("He had 4 meetings Wednesday and he could not function without his partner. He would lose his train of thought."); 1403 ("[b]rain fog continues and was worsened when patient ran out of Adderall").)

Four months post-accident, Dr. Mitchell wrote that Plaintiff "has been unable to earn a living during this time due to a severe post concussion syndrome with headaches, decreased mentation with memory loss and expressive aphasia, [and] cognitive dysfunction." (452.)

Plaintiff's subjective complaints continued consistently throughout 2018, after he submitted his LTD claim. (1403 ("[b]rain fog [is] unchanged"; "[s]till unable to work on Adderall 30 mg"; "[n]o improvement in memory"); 1717 ("still having difficulty finding words, lack of concentration, lapse of memory especially short term"); 1135 ("has continued cognitive dysfunction with short term memory loss. Episodes of confusion and expressive aphasia"); 1403 (as of 09/28/2018, "impaired and unable to perform his usual work activities," despite "some improvement in energy and brain fog"); 2324 ("problems with attention, concentration, and memory"); 1404 ("problems gauging passage of time," and unable to tell whether "a particular activity took place two weeks ago or two months ago").) Plaintiff's own undated

statement, submitted with his appeal on April 1, 2019, details what he means by certain statements, including "brain fog," loss of train of thought, and short-term memory loss.[10]  (1291, 1411.)

In concluding Plaintiff has established he is "disabled" within the meaning of the Policy, the Court gives significant weight to Plaintiff's subjective accounts of mental "fogginess," confusion, loss of train of thought, expressive aphasia, and forgetfulness.  Significantly, Plaintiff made these complaints on the day of the accident, his wife observed them, and Plaintiff has made those complaints consistently since the accident.  Moreover, Plaintiff's subjective complaints have been confirmed by two separate instances of objective neuropsychological testing.

Specifically, the results of Plaintiff's objective neuro-psychological tests were acknowledged as valid (based on built-in validity measures) by all doctors who commented on those tests.  Dr. McGee's testing recognized "mild deficits in attention and concentration" such that although Plaintiff would be "capable of learning a routine, repetitive skill, he would probably have difficulty if required to work under time constraints or to multitask."  (2329.)  Dr. Lewis tested Plaintiff as having experienced significant cognitive decline in the areas of auditory attention, visual attention, processing speed, perceptual flexibility, and executive functioning (related to the ability to multitask).  (1362-63, 1365-68.)  The Court gives great weight to the opinions of Drs. McGee and Lewis.  Each of these psychologists interviewed Plaintiff personally and each administered a series of neuropsychological tests that included built-in measures of validity.  And both Dr. McGee and Dr. Lewis opined Plaintiff would be unable to perform his regular occupation.

The opinions of Drs. McGee and Lewis are consistent with the opinions of

---

[10] Plaintiff describes "brain fog" as associated with difficulty performing routine tasks, such as becoming disoriented while grocery shopping and being unable to remember where things are located, leading to inefficiencies in routine tasks.  (1411.)  When Plaintiff describes losing his train of thought, he means "completely blanking out during an active conversation as to what the topic is," often triggered by being interrupted while speaking.  (1411.)  He also describes specific examples of short-term memory loss.  (1411.)

1    Plaintiff's two treating physicians, Drs. Mitchell and Dr. Sosin.  As of March 11,

2    2019, Dr. Mitchell opined that Plaintiff was totally disabled based on her observation,

3    examination, and treatment of Plaintiff and Plaintiff's symptoms associated diagnoses

4    of post-concussion syndrome, expressive aphasia, and short-term memory loss.

5    (1401.)  As of March 28, 2019, Dr. Sosin expressed the same opinion, relying on his

6    observation, examination, and treatment of Plaintiff and Plaintiff's symptoms

7    associated with his diagnosis of post-concussion syndrome.  (1402-06.)  The Court

8    gives great weight to the opinions of Drs. Mitchell and Dr. Sosin, not only because

9    these doctors actually examined Plaintiff, but also because they treated him on an

10    ongoing basis, both before and after the accident, and therefore they had had the

11    opportunity to personally observe him and interact with him before and after the

12    accident.

13         The Court finds that Plaintiff's subjective reports of loss of train of thought, his

14    observed and subjectively reported expressive aphasia, together with measured

15    deficits and/or decline in areas of attention, concentration, perceptual flexibility,

16    processing speed, and executive functioning combine to limit Plaintiff from

17    performing many or most of the "material and substantial duties" of his "regular

18    occupation."  For instance, Plaintiff's regular occupation regularly required him to

19    work on several projects over the same time period, which would be adversely

20    affected by his reduced ability to multitask (as measured by testing of executive

21    functioning).  Additionally, difficulties in the area of attention, concentration, and

22    processing speed would impact his ability to absorb and analyze new information.

23    And of particular note, once these impairments became evident, which they quickly

24    did, the ability to influence the opinions, attitudes, and judgments of others in the

25    executive recruitment process would become nearly (if not completely) impossible.[11]

26

27    _____

     [11] In this regard, the Court notes that Plaintiff was an executive recruiter rather than a recruiter for
28    lower-level positions.  By definition, the candidates for executive positions are seeking positions at
     the highest level of Plaintiffs' clients' organizations to further their own already successful careers.
     Correspondingly, Plaintiff's employer-clients sought Plaintiff's assistance in helping them to fill

Plaintiff's "regular occupation" requires not only the ability to identify the best candidate for an open executive position, but also the ability to then "sell" the position to the candidate and to "sell" the candidate to the employer.  Plaintiff's measured cognitive deficits limits him from doing this.

### D.   Unum's File Reviews Do Not Alter the Court's Findings Regarding Plaintiff's Ability to Perform the Material and Substantial Duties of His Regular Occupation

Unum's file reviews, performed by multiple reviewers at two levels, do not convince the Court otherwise.

### 1.   Initial Review (Drs. Zimmerman, Folkening, and Coughlin)

Unum's initial decision to terminate Plaintiff's LTD benefits in October 2018 was based on the file reviews of Drs. Zimmerman, Folkening, and Coughlin.  These doctors based their assessments on Plaintiff's abilities to attend to the cognitive activities of his daily life, his written communications to Unum, his passing score on the MoCA, the lack of formal neuro-psychological testing, and the lack of treatment intervention by his providers.

### a.   Dr. Zimmerman

Dr. Zimmerman's seeming rejection of Plaintiff's claim for benefits (as noted in the file) based on his cognitive complaints was not warranted.  When Dr. Zimmerman reviewed Plaintiff's email inquiring what type of neuropsychological testing would be required by Unum to review his claim, Dr. Zimmerman appears to conclude that Plaintiff's claim for benefits based on his cognitive functioning should be rejected based upon his ability to author the email she reviewed.   To be sure, Plaintiff's email (862-63) is thorough, detailed, and well-organized, but from the email itself, there was no way of knowing whether Plaintiff had assistance in drafting it, or how long it took

---

corporate leadership positions.  Thus, Plaintiff's regular occupation required him make a match that would alter his clients' organizations at their highest level.  Simply put, both the candidates and Plaintiff's clients have the ability and incentive to closely scrutinize Plaintiff's work performance, and their confidence in him would be of paramount concern to them.

him to draft, or whether it required extensive revision before it was sent.  (*Cf.* 863 ("Sorry for the lengthy email, but I wanted to make certain I communicated everything with you rather than discuss by phone with the strong possibility that I'd forget something.").)  Unum did not ask; instead, Dr. Zimmerman concluded, based solely on that email itself, that Plaintiff retained "higher-level thinking skills" that were inconsistent "with any type of cognitive deficit."  (890.)

Unum's treatment of the need for neuropsychological testing was inconsistent and evidences "hide-the-ball" tactics.  Although Dr. Zimmerman appears to have concluded that the written communication skills needed to author that email precluded Plaintiff's claim based on cognitive complaints, the communication to Plaintiff was that Unum "will not need you to have this testing completed for on-going claim review."  (921.)  This was a misleading communication.  This communication purports to respond to Plaintiff's questions about the need for such testing to substantiate his claim, including questions that went so far as to ask Unum to sort among a list of specific testing to identify those areas Unum was most interested in having tested.  However, this communication to Plaintiff was a wholly different message than what was conveyed internally.  Specifically, while the message ***among*** Unum employees[12] continued to be that Plaintiff's written communication was "not consistent with any type of cognitive defect" (890), implying that additional evidence would be needed to substantiate Plaintiff's claim on this basis, the message ***to*** Plaintiff was that, from Unum's perspective, there was no need for him to pursue any type of objective neuropsychological testing to substantiate his claim.  This communication set up Plaintiff's claim for failure.

Indeed, a few months after this communication to Plaintiff that Unum "[would]

---

[12] (*See, e.g.*, 1158 (notes from Aug. 28, 2018 meeting of two clinicians and two claims personnel, responding to Dr. Mitchell's identification of Plaintiff's R&Ls as "unable to function at meetings due to loss of memory, speech limitations, headaches, and medications," with "the insured is able to manage his household finances and he is able to drive a motor vehicle, he is able to write lengthy emails with higher vocabulary . . . and he is well past the usual recovery time for a concussion with no [loss of consciousness]").)

not need [him] to have this testing," Unum informed Plaintiff that it denied his claim in part based on the fact that no neuropsychological testing was ordered or otherwise undertaken.  In fact, Unum stated this basis for denial ***three times*** in its denial letter. (*See* 1248 ("There has been no arrangement for more formal or comprehensive neurocognitive testing."); 1248 ("Despite your persistent complaints of function limiting cognitive impairment for more than a year, neither you nor your providers (including another neurologist) have suggested or insisted that there be more comprehensive structured evaluation of neurocognitive function."); 1249 ("[T]here has been no formal assessment of your neuro-cognitive status to support Dr. Mitchell's opinion.").)

The fact that Dr. Zimmerman was noted as observing that Plaintiff's treating physicians "could refer him for testing" if they believed he had "cognitive deficits that would affect his ability to work" (890) does not salvage Unum's fractured approach to addressing this issue.  Due to the nature of the relationship, as alluded to in *Nord*, treatment providers do not approach their patients' subjective complaints with the same skepticism as do their patients' insurers.  *Cf. Nord*, 538 U.S. at 832 ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled' so a treating physician, in a close case, may favor a finding of 'disabled.'"). Because Plaintiff's insurer told him that it "[would] not need [him] to have this testing completed for on-going claim review" (921), and because Plaintiff encountered difficulty in getting his medical insurer to cover such testing, foregoing testing was wholly reasonable.  There is no evidence in the record to suggest that such testing was medically necessary in order to treat Plaintiff in an effective manner.  And in any event, here, neuropsychological testing eventually confirmed the subjective complaints upon which Plaintiff's treating physicians relied to treat him.

### b.    Dr. Folkening

Turning to Dr. Folkening's conclusion, it was based in part on the fact that Plaintiff's complaints had persisted beyond that which might be expected from a

seemingly minor accident, and the fact that there had been no formal and comprehensive neurocognitive testing.  (1228-1230.)  Plaintiff's unremarkable CT scans indeed provide some support for an inference of minor injury but, as discussed below, the Court credits Dr. Sosin's view (and to an extent, Dr. Brown's view) that even minor head injuries can lead to significant cognitive deficits, especially in individuals with preexisting psychiatric conditions.  And the fact that Plaintiff's cognition had not been formally tested is as discussed above.

Moreover, Dr. Folkening's reliance on MoCA testing of 26/30 to conclude Plaintiff had no "major impairment," reveals a lack of depth of Dr. Folkening's understanding of the duties of Plaintiff's "regular occupation."  (1229.)  Although the MoCA, described *supra* footnote 8, may have great value as a diagnostic tool to screen for obvious cognitive deficits, Plaintiff's low passing score does not evidence the ability to perform his duties as an executive recruiter.

### c.  Dr. Coughlin

The same is true of Dr. Coughlin's opinion on his file review, which also relied on both the normal MoCA score and the lack of "formal assessment of cognitive status."  (1236.)  Dr. Coughlin introduced a new basis for rejecting Plaintiff's claims, stating that Plaintiff's "current lack of capacity opined by Dr. Mitchell" was unsupported "because the level of current intervention [was] inconsistent with the severity" of Plaintiff's subjective complaints.[13]  (1236.)  Thus, Dr. Coughlin assessed Plaintiff's disability based on the supposed failure of his treatment providers to order more aggressive treatment, which seems at best a tenuous basis on which to make any conclusion regarding whether Plaintiff's stated R&Ls were supported.  (1236.)  But Dr. Coughlin's lack of elaboration strips this statement of any persuasive value:  Here, there is no indication of what treatment Dr. Coughlin felt should have been pursued,

---

[13] Unum ultimately relied on this conclusion in denying Plaintiff's claim.  (1249 ("[N]either you nor your providers . . . have suggested or insisted that there be a more comprehensive structured evaluation of your neurocognitive function.").)

1   or why he felt such treatment should have been pursued; moreover, there is no
2   indication as to whether Plaintiff's treatment providers considered (and/or rejected)
3   more aggressive treatment.

4        Therefore, the Court's is not persuaded by the opinions of any of these three file
5   reviewers.

6                    **2.    Plaintiff's Appeal**

7        After Plaintiff's counsel filed his appeal, Unum sought review from three other
8   doctors, Drs. Crawford, Black, and Brown.  The Court is also not persuaded by their
9   opinions.  First, Dr. Crawford's opinion fails to take into account important medical
10  evidence; second, Dr. Black's criticisms of Dr. Lewis's stated assumptions are
11  unpersuasive; finally, Dr. Brown's opinion builds in part on Dr. Crawford's and Dr.
12  Black's faulty foundations and is, in any event, refuted by Dr. Sosin's and Dr. Lewis's
13  reports.

14                   **a.    Dr. Crawford**

15       Dr. Crawford observed that continued expressive aphasia was not consistent
16  with what would be anticipated based on "the mechanism of injury," Plaintiff's
17  normal neurological exams, and his unremarkable CT scans.  She explained that
18  "[n]eurological deficits are maximal in the hours and days after a brain injury," before
19  going on to note that Plaintiff did not demonstrate evidence of aphasia in that time
20  frame, citing Plaintiff's visits to an urgent care facility on the day of the accident, and
21  a visit to the ER less than a week after the accident.  But Dr. Crawford's citation to the
22  medical evidence is selective, and the evidence of record in fact shows Plaintiff
23  consistently complained of aphasia and other cognitive deficits in the days, weeks, and
24  months following the accident.

25       On the day of the accident, Plaintiff complained to Dr. Wilder that he "lost [his]
26  train of thought."  (368.)  And as for the ER visit six days later, although Dr. Crawford
27  correctly quoted the Hoag Memorial physical exam notes as stating "[n]o aphasia,"
28  this note reflects only that the doctor examining Plaintiff did not observe any aphasia.

(*See* 731 (making this notation under the heading ("Physical Exam: Neurological:").) The notes from that ER visit reveal two other notations reflecting Plaintiff's complaints of aphasia. (717 (upon presentation, Plaintiff complained of "losing his train of thought mid-sentence"); 730 (Plaintiff recounted that he had to leave a meeting at work three days earlier "because he was . . . having trouble finding words").) And in between the urgent care visit and the ER visit, four days after the accident, Dr. Sosin noted that Plaintiff told him that "[h]e . . . had felt foggy, not remembering what he was saying by mid-sentence." (1403.) Indeed, as recounted in detail herein, the record shows that Plaintiff made consistent complaints of this type in the days, weeks, and months after the accident.

Additionally, Dr. Crawford chose not to comment on the available objective data: Although Dr. Crawford noted the availability of Dr. Lewis's neuropsychological report and raw test data, she made no attempt to reconcile her conclusions with the results of the testing. (2071.) This failure further evidences Dr. Crawford's arbitrary selectivity and further weakens her opinion.

### b.   Dr. Black

As for Dr. Black's review, the Court observes at the outset that he was not asked to comment on Plaintiff's ability to perform his regular occupation; therefore, he does not tie his assessment to Plaintiff's job duties. (*Compare* 2350 (asking "[w]hat cognitive function is demonstrated in the neuropsychological testing?") *with* 2352 (answering that question without reference to the duties of Plaintiff's regular occupation).) Instead, because Dr. Black was specifically asked to comment on the neuropsychological testing, his review focused primarily on Dr. Lewis's report and testing.

Within that focus, Dr. Black first criticized what he saw as Dr. Lewis's incorrect assumptions regarding the level of Plaintiff's baseline, pre-accident cognitive functioning. (2351 (Dr. Black); *cf.* 1361 (Dr. Lewis).) Dr. Lewis estimated Plaintiff's baseline, pre-accident intellect to be in the Superior to Very Superior range,

corresponding to an intelligence quotient level of 125 to 130 or higher.  (1361.)
Conversely, Dr. Black used "standard statistical estimation methods" to estimate
Plaintiff's baseline at a lower mark, thus showing a lesser decline, and noting only
"mildly lower than predicted" functioning in "many domains, primarily Attention,
aspects of Learning and Memory, Processing Speed, and aspects of Executive
Functioning."  (2351.)

However, for three reasons, the Court credits Dr. Lewis's baseline estimate of
Plaintiff's pre-accident cognitive functioning over Dr. Black's estimate:  First,
Plaintiff's career experience (as set forth in his resume), second, subjective accounts
of others who observed him before and after the accident (including his employer and
two treating physicians), and third, Plaintiff's scores in areas of cognition that tend to
survive traumatic brain injury.

More specifically, first, even assuming Dr. Lewis relied on Plaintiff's
recounting of his SAT and GMAT scores from the late 1970s and early 1980s rather
than documentary evidence of those scores, the record is clear that Plaintiff's GMAT
score was high enough for him to be admitted to Columbia University's Graduate
School of Business, where he earned a Master's Degree.  (1378.)  Thereafter, Plaintiff
went on to work for a number of major corporations, holding various positions with
titles such as product director, marketing director, business director, general manager,
chief marketing officer, vice-president, president, and chief executive officer, before
going on to serve on a corporate board of directors and running a consulting business.
(1375-78.)  Only after working in all these positions did Plaintiff become an executive
recruiter.  (1375.)  This career path strongly supports the accuracy of Dr. Lewis's
estimate in the Superior to Very Superior range of intellect.

Second, Dr. Lewis's baseline estimate is also supported by Plaintiff's
employer's account of Plaintiff's functioning before the accident and his decline after
the accident.  The same is true of the observations of Plaintiff's treating physicians,
Drs. Mitchell and Sosin, who treated him before and after the accident.

Finally, Dr. Lewis noted that Plaintiff's high score in Verbal Comprehension tended to confirm her baseline estimate.  Plaintiff scored in the 95th percentile in this area, which Dr. Lewis observed "tend[s] to remain the most robust in the face of most types of cognitive functioning deficits, such as those sustained in a motor vehicle accident." (1361.)  She explained that "[a]s a result[,] these tasks tend to be good predictors of pre-morbid intellect, and, thus, are consistent with this examiner's interpretation of pre-morbid intellect being very high, in the Superior to Very Superior Range." (1361.)  Despite his other criticisms, Dr. Black does not dispute this observation.

For all these reasons, the Court credits Dr. Lewis's estimate as an accurate measure of Plaintiff's baseline, pre-accident intellectual functioning.  The pre-accident estimate of Plaintiff's intellect was not the only disagreement between Drs. Black and Lewis.  They also disagreed on how the "practice effect" may have influenced Plaintiff's test results.

Dr. Lewis was of the opinion that Plaintiff's performance was enhanced by the practice effect, that is, as the result of Plaintiff having taken the same or similar neuropsychological tests (administered by Dr. McGee) three months prior to Dr. Lewis's testing.  (1360-1362, 1364-65.)  Thus, she believed that Plaintiff's deficits may have been understated by the test results that included artificially inflated scores. (1360.)  Dr. Black acknowledged that the practice effect could have influenced the test results, but he believed that if it did, this would actually be an indication of the lack of severity of Plaintiff's impairment, noting that it would "indicate[] memory that is adequate for learning specific test items . . . and remembering the items over a three month period," especially given that Plaintiff would have been unaware of any need to remember the information (and thus unlikely to make a special effort to remember it). (2351.)  Both of these conflicting opinions are plausible; as such, neither is particularly persuasive.  There is simply no evidence suggesting one conclusion is more sound than the other.  As it is, both Dr. Lewis and Dr. Black agree the test

results were valid based on built-in measures of validity, and as explained at length herein, those results, considered with the other evidence of record, support the finding that Plaintiff is unable to perform the substantial and material duties of his regular occupation due to cognitive deficits.

### c.   Dr. Brown

As to Dr. Brown's review, the Court notes at the outset that he relied on Dr. Crawford's analysis of Plaintiff's "neurological condition and associated level of function" and Dr. Black's conclusion that the "[t]esting results indicate, at most, mild impairment" (2364-65); therefore, to extent these analyses factor into Dr. Brown's opinion, it suffers from the same weaknesses as do Dr. Crawford's and Dr. Black's. More substantively, Dr. Brown saw Plaintiff's cognitive impairments as an exacerbation of a preexisting chronic psychiatric condition, presumably ADD, a condition that would "benefit from on-going treatment." (2364.) But Dr. Sosin considered this issue and saw a clear differentiation between Plaintiff's ADD and his impairment as a result of the accident. (1405.) Dr. Sosin noted that because he treated Plaintiff before and after the accident, he was able to "make a comparison of his symptoms which were attributed to ADD [and the] impairment caused by the accident," opining that although "there can be some overlap between symptoms of ADD and those attributed to post-concussion syndrome," in Plaintiff's "case, there [was] a clear differentiation between his ADD symptoms and those of his post-concussion syndrome."[14] (1405.) Despite having Dr. Sosin's report, Dr. Brown did not discuss Dr. Sosin's remarks regarding this "clear differentiation." (2364.) And Dr. Brown himself acknowledged that Plaintiff had "a long-standing psychiatric condition," which gave him a "significantly higher risk of having persistent cognitive, affective and somatic symptoms after a comparatively mild head injur[y]." (2364.)

---

[14] In interpreting Plaintiff's test results, Dr. Lewis agreed. She concluded that the deficits revealed by Plaintiff's test results were beyond those that would be expected as a result of ADD. (1368 (noting that "[t]he deficits that are discussed are far greater than can be accounted for by an attention deficit hyperactivity disorder").)

In light of these weaknesses, the opinions of Unum's three file reviewer conclusions on appeal do not suggest to the Court that Plaintiff has failed to meet his burden of proof that he is disabled or that he remains able to perform the material and substantial duties of his regular occupation.

On these findings of fact, therefore, the Court makes the conclusions of law set forth in the next section.

## IV.   CONCLUSIONS OF LAW

The Policy at issue is an "employee welfare benefit plan" governed by ERISA. *See* 29 U.S.C. § 1002(1).

Plaintiff has met his burden to establish by a preponderance of the evidence that he continued to be "disabled" from performing the "material and substantial duties" of his "regular occupation" due to "sickness or injury," as defined by the Policy, after the date Unum discontinued his LTD benefits.  Therefore, Unum's denial of his claim is overturned.

Because the administrator "applied the right standard, but came to the wrong conclusion" regarding whether Plaintiff was disabled from his "regular occupation," the appropriate remedy for the time remaining in the "regular occupation" eligibility period is "[r]etroactive reinstatement of benefits."  *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001).  Accordingly, the Court orders that Plaintiff be paid benefits under the terms of the Policy for the remainder of the approximately twelve months of the "regular occupation" standard of determining disability.

For the time period after that, because Unum has not yet considered the relevant standard, the appropriate remedy is to remand to the administrator to consider whether Plaintiff is "disabled" under the "any gainful occupation" standard in the Policy that applies after the first 24 months of disability.  *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996) (holding it was error for the district court to order payments beyond the initial 24-

month disability period where the standard for determining disability changed after the 24-month mark); *see, e.g., Carey v. United of Omaha Life Ins. Co.*, No. SACV1300740CJCAJWX, 2017 WL 1045077, at *11 (C.D. Cal. Jan. 31, 2017) (citing *Saffle* and holding that remand to the plan administrator was appropriate remedy to consider whether the plaintiff was disabled under the "any gainful occupation" standard); *Hantakas v. Metro. Life Ins. Co.*, No. 214CV00235TLNKJN, 2016 WL 374562, at *7 (E.D. Cal. Feb. 1, 2016) (same); *Wilkins v. Unum Life Ins. Co. of Am.*, No. CV 10-02940 JSW, 2013 WL 5340512, at *5 (N.D. Cal. Sept. 24, 2013) (same).

## V.    CONCLUSION

As set forth herein, the Court awards benefits to Plaintiff for the remainder of the approximately twelve months of the "regular occupation" standard of determining disability.  The Court remands the matter to the claims administrator to consider whether Plaintiff meets the definition of "disabled" under the definition that applies after the first twenty-four months.

Plaintiff shall prepare and lodge a proposed judgment within fourteen days of the entry of this Order.  Any objections to the judgment must be filed within seven days thereafter.

In accordance with the Court's Local Rule 54-7, any motion for attorney fees shall be filed no later than fourteen days after the Court's entry of judgment and shall be noticed for the Court's first available motions hearing date.  This deadline may be extended by stipulation of the parties.

**IT IS SO ORDERED.**

**DATED:** March 22, 2021

The Hon. Josephine L. Staton
United States District Judge